IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

| | |
|---|---|
| ARC CONTROLS, INC.,<br>　　Plaintiff,<br><br>v.<br><br>M/V NOR GOLIATH, *in rem*, and<br>GOLIATH OFFSHORE HOLDINGS PTE.<br>LTD., *in personam*<br>_____ | )<br>)<br>)<br>)<br>)  CASE NO. 1:19-cv-391-LG-RPM<br>)<br>)  *Consolidated with:*<br>)  CASE NO. 1:19-cv-395-HSO-JCG<br>)<br>) |

## GOLIATHS' MEMORANDUM IN OPPOSITION TO
## ARC CONTROL INC'S MOTION FOR SUMMARY JUDMENT

**MAY IT PLEASE THE COURT:**

Defendants, M/V NOR GOLIATH, *in rem*, and GOLIATH OFFSHORE HOLDINGS PTE. LTD., *in personam* (collectively "Defendants" or "Goliath"), respectfully submit this memorandum in opposition to Entier USA, Inc's ("Entier") Motion for Summary Judgment. Rec. Doc. No. 380. As further discussed below, there exists genuine issues of material fact that are in dispute regarding the alleged services provided by Entier and whether they constitute a valid maritime lien. Thus, Entier's motion for summary judgment should be denied.

### FACTUAL BACKGROUND

This case arises out of the disastrous default by Epic Companies, LLC ("Epic") on its financial obligations to Goliath, as well as to all of the Epic Vendors who have appeared in this proceeding to arrest or lien Goliath's vessel, forcing Goliath to pay them what Epic failed to. Epic was the charterer and the operator of the M/V NOR GOLIATH ("vessel") when Epic defaulted on the numerous obligations it incurred for its sole benefit during the voyage it conducted. Following

1

the bareboat charter to Epic, Goliath had no control of the services and/or goods that Epic contracted for the benefit of itself and its project.

Entier alleges it provided food and catering services to the M/V NOR GOLIATH from April 2019 through August 2019. *See* Rec. Doc. No. 250, Page 2. However, the M/V NOR GOLIATH was arrested on July 12, 2019, and any charges incurred after that cannot constitute a maritime lien against the vessel. Entier testified that it only provided services in conjunction with the Goliath for 3 months, ending on July 19, 2019 (not in August of 2019). Moreover, Entier was providing services to a variety of companies and their personnel contracted by Epic, not, as it claims, solely to the M/V NOR GOLIATH or its "crew." This included supplies and goods furnished to employees of Epic and/or its subsidiaries and to various other Claimant/Intervenors in this suit, who provided offshore workers to Epic and who did their work on or about the platforms Epic was decommissioning. The M/V NOR GOLIATH cannot be held liable for debts it did not incur which were not for its benefit or safety, or for debts which were procured by those who did not have the authority to subject the vessel to a maritime lien.

## RESPONSE TO ENTIER'S STATEMENT OF UNDISPUTED FACTS

1. From April 2019 through August 2019, Entier supplied food and catering services to the M/V NOR GOLIATH.

   **Response:** Denied. Entier could not provide food or catering services during July and August of 2019 as the vessel was arrested in this litigation on July 12, 2019, and services it provided were to employees of many different companies, including Epic, not solely to the "crew" of the M/V NOR GOLIATH. Moreover, Entier's testimony is that it demobilized and left NOR GOLIATH on July 19, 2019.

2. Food and catering services constitute "necessaries" pursuant to CIMLA.

   **Response:** Denied. Goliath objects to this "Undisputed Fact" as it is not factual in nature but calls for a legal conclusion. Food and catering services are not named in the text of the CIMLA.

3. Entier provided invoices for its services to Epic totaling $456,476.10.

   **Response:** Denied. Entier has invoiced Epic for goods and services following the arrest of the M/V NOR GOLIATH on July 12, 2019. Goliath is without knowledge of what exactly Entier invoiced Epic and why.

4. Entier has not been paid for its necessary services.

   **Response:** Denied. Whether the services allegedly provided by Entier were "necessary" calls for a legal conclusion. To whom any service were "necessary" are questions of fact, as most services provided by Entier were not necessary to Goliath.

## **LAW AND ARGUMENT**

**A.     Summary Judgment Standard.**

Summary judgment is appropriate if the moving party can establish through the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party can establish its burden by demonstrating a lack of evidence to support the nonmoving party's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Once the moving party has established this, the burden shifts to the nonmoving party to present "a sufficient showing on an essential element of her case…" *Id.* at 323. All facts and inferences are generally viewed in the light most favorable to the non-moving party. *Haverda v. Hays Cnty.,* 723 F.3d 586, 591 (5th Cir. 2013).

**B.     The Commercial Instruments and Maritime Lien Act.**

Maritime liens are governed by the Commercial Instruments and Maritime Lien Act (CIMLA), otherwise known as 46 U.S.C. § 31301-31343. "Maritime liens are stricti juris and will not be extended by construction, analogy, or inference." *Racal Survey U.S.A., Inc. v. M/V COUNT FLEET,* 231 F.3d 183, 192 (5th Cir. 2000). A maritime lien must arise from an underlying contract which has reference to maritime service or maritime transactions. *Exxon Corp. v. Central Gulf*

3

*Lines, Inc.,* 500 U.S. 603, 610 (1991). The purpose of providing a maritime lien for provisioned necessaries is to facilitate the continuous operation of vessels by encouraging vendors to promptly supply vessels with essential supplies and repairs. *Racal Survey*, 231 F.2d at 187. In the context of maritime liens, a vessel is considered a distinct entity that is held responsible **only for its own debts**. *Riffe Petroleum Co. v. Cibro Sales Corp.*, 601 F.2d 1385, 1389 (10th Cir. 1979).

During an *in rem* action to enforce a maritime lien, the issues are: "(1) whether the materials and/or services were provided as claimed; (2) whether the materials and/or services provided were "necessaries" within the meaning of the CIMLA; (3) whether the charges were reasonable in amount; and (4) whether "the person who placed the order had authority to do so, either real, apparent, or statutorily presumed." *Ceres Gulf v. M/V Kapitan Ponomarev,* 1998 U.S. Dist. LEXIS 6429, at *3 (E.D. La. April 28, 1998); *quoting Belcher Co. of Alabama v. M/V MARATHA MARINER,* 724 F.2d 1161, 1164 (5th Cir. 1984). Section 31341(a) of CIMLA provides the following list of those who have the authority to procure necessaries:

> (1) The owner; (2) the master; (3) a person entrusted with the management of the vessel at the port of supply; or (4) an officer or agent appointed by: (a) the owner; (b) a charterer; (c) an owner pro hac vice; or (d) an agreed buyer in possession of the vessel.

Entier was not an entity who had the authority to procure necessaires and any expenses Entier incurred through its subcontractor WRIST were never authorized by Goliath or Epic. There is no evidence that they were ever authorized, and in fact, Goliath did not.

**C.     Entier did not provided "necessaries" to the M/V NOR GOLIATH.**

In support of its argument, Entier cites to *Trico Marine Operators v. Falcon Drilling Co.,* for the proposition that food and drinking water are necessaries. 116 F.3d 159, 162 (5th Cir. 1997). However, in that case the Fifth Circuit actually stated that the supplies provided were "drinking water and food **for the crew...**" *Id.* It is apparent from the Entier invoices that it supplied food

4

and catering services to a wide variety of persons and companies, not limited to the crew of the M/V NOR GOLIATH.  Epic retained a crew of approximately twenty-eight seamen from a crewing company.  However, on May 31, 2019, Epic's invoice notes that "POB" (Personnel on Board) was 124 persons -- a far greater number than the crew of the NOR GOLIATH.  *See* Exhibit "A," Invoice for Food and Cleaning from May 2019.  The vast majority of these persons were not engaged in the service of the vessel nor in the operation of the heavy lifts which were the M/V NOR GOLIATH's mission and function.  Instead, these other persons provided a wide-range of services related to Epic's project of decommissioning and dismantling offshore platforms.  They included welders, divers, riggers and were perhaps necessary to Epic and Epic's mission, but the NOR GOLIATH was hired for the heavy lift capacity of its cranes.  How the dozens of personnel furnished to Epic by other companies under contract to Epic were housed and fed were the responsibility of Epic, who hired them for Epic's sole purposes.

The Epic Daily Project Report from the same date notes that ten different companies had persons on board the Goliath on May 31, almost none of whom were crew operating the M/V NOR GOLIATH.  *See* Exhibit "B," Epic Daily Project Report for May 31, 2019.  Of the 129 "Personnel on Board" only 28 were the "crew" of the M/V NOR GOLIATH, and were onboard to operate and maintain the vessel.  The rest were a hodgepodge of offshore workers and divers procured by Epic for its project and its purposes, 47 of whom were Epic's (or its subsidiaries) direct employees.  Goliath is not responsible for expenses Epic incurred for its own employees performing services separate from the crew of the vessel or the function Goliath was contracted by Epic to perform.

Maritime liens are not created and do not exist simply to allow a company a means to shift responsibility from the company which contracted it and created the debts, to a vessel pursuant to a statute intended to secure only debts incurred on behalf of the vessel.  Rather, the purpose of a

maritime lien is twofold, first to facilitate the continuous operation of a vessel by encouraging suppliers to provide essential items and repairs to the ship, and second, to ensure a ship cannot sail away from debts it incurred for itself.  *See Racal Survey,* 231 F.2d at 187.

Entier testified that the number of people on board dictated how many employees Entier would provide to Epic and how much it charged to Epic.  *See* Exhibit "C" Corporate Deposition of Entier, Page 15, Lines 14-24.  Its invoices reflect its practice of charging per person on board.  Entier also charged for "extra meals" which were provided to visitors or people onboard for only part of the day, as requested by Epic.  (Entier does not know who these people were or why they were onboard the vessel).  *Id.* at Page 20, Lines 7-24; Page 50, Lines 3-18.  Visitors and people on board for such limited amounts of time were determined at Epic's discretion, were clearly not NOR GOLIATH crew, and no evidence has been presented as to how food provided to these non-crew, non-Goliath individuals was "necessary" to the M/V NOR GOLIATH.  Entier admits that it does not know who employed any of the various persons on board the Goliath, nor was it aware of why they were aboard the vessel.  *Id.* at Page 39, Lines 7-12; Page 41, Lines 1-25.  Ultimately, Entier provided its goods and services to a large array of Epic and third-party employees, subcontractors, and offshore workers – not necessaries to the vessel.  Though these various persons may have been required for *Epic's* project, they simply did not contribute to the mission of the M/V NOR GOLIATH to perform heavy-lifts.

Entier also provided a variety of additional or supplemental goods at the direction of Epic. See Rec. Doc. No. 250-4, Page 2; 250-5, Page 2; 250-6, Page 2.  However, it is not proven for whose benefit these charges were incurred, instead Entier again groups every expense incurred by Epic against the M/V NOR GOLIATH.  Entier also purchased P&I insurance from SeaCrest to cover its employees, which it back-charged to Epic.  *See* Exhibit "C" Corporate Deposition of

Entier, Page 47, Line 14- Page 48, Line 12.  This P&I insurance is described as covering a year, from 11/04/19- 11/04/20.  Rec. Doc. No. 250-4, page 8.  It is not shown by Entier if this amount has been prorated among the multiple vessels Entier was working on in Epic's fleet, but regardless Entier was only working with the M/V NOR GOLIATH for at most a three-month period.  *See* Exhibit "C" Corporate Deposition of Entier, Page 44, Lines 9-12.  Goliath cannot be responsible for an entire years worth of insurance when Entier itself admits it only worked with the M/V NOR GOLIATH for 3 months.

### D. Entier cannot hold a maritime lien for services/goods charged following the arrest of the M/V NOR GOLIATH.

Expenses and costs incurred while a vessel is under arrest and in judicial custody do not create a maritime lien but can only be allowed as custodia legis expenses if they are advanced to preserve and maintain the vessel and furnished under the authority of the court.  *Calogeras Marine, Inc. v. M/V Ocean Leader,* 1997 U.S. Dist. LEXIS 17791 at *11 (E.D. La. 1997).  Here, Entier attempts to assert a maritime lien for services and goods which it claims occurred after the arrest of the vessel on July 12, 2019.  All Entier employees were demobilized and removed from the vessel on July 19, 2019, after Epic had failed to pay Entier. *See* Exhibit "C" Corporate Deposition of Entier, Page 56, Lines 1 – 10.  Yet, Entier alleges additional expenses from July through August in its maritime lien.  *See* Rec. Doc. No. 250-6 and 250-7.  This appears to be a claim for future lost revenues/profits after Entier's demobilization, not for services actually rendered.

In it's July Invoice, Entier has charges which reference WRIST expenses, including containers, which Entier could not explain, and further information on these expenses has not been produced.  *See* Exhibit "C" Corporate Deposition of Entier, Page 58, Line 9 – Page 61, Page 9; and see Rec. Doc. No. 250-6, page 8.  WRIST was Entier's supplier for food and equipment.  *Id.* at Page 45, Lines 11-19.  Two of these charges are dated after the vessel was arrested.  Rec. Doc

7

No. 250-6, Page 8.  Entier's inability to explain these charges establishes at the least that material facts are in dispute as to what these services and/or goods were and whether they were "necessaries" sufficient to establish a maritime lien.

Similarly, in August Entier invoiced Epic $45,500.20 described as "stock handover," which Entier left aboard when it demobilized and departed from the vessel and additional charges of $28,820.72 for containers owned by WRIST which it abandoned aboard the NOR GOLIATH.  *See* Exhibit "C" Corporate Deposition of Entier, Page 62, Lines 2-25; Page 64, Lines 6-25.  Entier testified that it was not Goliath who prevented this removal, but sheriff's officers onboard following the vessel's arrest by the other Claimant-Intervenors in this suit.  *Id.*  Entier does not know what happened to these shipping containers, if anyone has used the containers since they were abandoned aboard the M/V NOR GOLIATH, or why WRIST (its apparent sub-contractor) did not attempt to retrieve them after this Court granted permission and the vessel was released from arrest.  *Id.* at Page 65, Line 17 – Page 66, Line 17.  Indeed, it may be that WRIST very well did retrieve its containers.  These charges for time periods when none of Entier's employees were aboard the NOR GOLIATH, no work was being performed by Entier, and while the vessel was under arrest, cannot form a valid maritime lien.

Neither Epic nor Goliath had a contractual agreement with WRIST, such that any expenses incurred by WRIST cannot form a maritime lien against the vessel, as it was not incurred by a person who had the authority to procure necessaries.  *See* 46 U.S.C. § 31341(a)  Entier testified that these containers were WRIST's equipment, not Entier's, which were invoiced to Entier by WRIST. *See* Exhibit "C" Corporate Deposition of Entier, Page 64, Lines 20-25.  That WRIST may have charged Entier for this "loss" does not entitle it to simply lump these expenses into its claim against Goliath.  In any event, no proof of payment has been shown.  These alleged expenses and

costs also accrued while the vessel was under arrest, which is a bar to establishing a valid maritime lien.

Likewise, Entier's and WRIST's own failure to retrieve their equipment and supplies following demobilization cannot be held against Goliath as a maritime lien. Goliath Offshore went to great time and expense to follow the proper procedures with U.S. Customs and this Court to obtain permission to release all items from the M/V NOR GOLIATH owned by numerous Epic vendors. Yet, Entier now argues that this equipment and goods aboard the vessel were abandoned by it but still claim it as a monetary loss against Goliath. Moreover, neither Entier nor WRIST contacted Goliath about this properly to explain why they could not remove it, nor did they take any action after this Court modified the arrest to allow the removal of equipment. Rec. Doc. No. 129. Their claim is an admission that they took no action to retrieve this equipment even after a surety bond was posted and the vessel was released from arrest. Rec. Doc. No. 187. Goliath should not be punished for any lack of diligence of Entier and WRIST to remove their equipment. Additionally, the accrual of these faux "necessaries" after the arrest of the vessel do not establish a maritime lien.

## CONCLUSION

Goliath has suffered from Epic's failure to pay charter hire and now Entier seeks to inflict still more pain by having Goliath pay Entier what Epic owes it. However, there is simply no legal authority which would subject Goliath to all the costs incurred by Epic for Epic's entire project in the Gulf of Mexico. Maritime liens are stricti juris, not to be extended by construction, analogy, or inference. Assessing Goliath with every debt Epic ran up during its project in the Gulf is not only unsupported by the Commercial Instrument and Maritime Lien Act, but to do so is punitive and beyond the scope, goal, and historical intent of a maritime lien. There are multiple, material

issues of fact in dispute relating to Entier's lien, as well as the veracity of the claimed "necessaries" provided to the M/V NOR GOLIATH. As such, Entier's Motion for Summary Judgment must be denied.

Respectfully submitted:

*/s/Miles P. Clements*
James G. Wyly, III, MS Bar 7415
Phelps Dunbar LLP
2602 13th Street, Suite 300
Gulfport, Mississippi 39501
Telephone: (228) 679-1130
Facsimile: (228) 679-1131
E-Mail: jim.wyly@phelps.com

-and-

Miles P. Clements, T.A. (4184)
Joseph E. Lee III (26968)
Zachary J. Ardoin (37575)
Phelps Dunbar LLP
365 Canal Street, Suite 2000
New Orleans, Louisiana 70130
Telephone: (504) 566-1311
Facsimile: (504) 568-9130
E-Mail: miles.clements@phelps.com
josh.lee@phelps.com
zachary.ardoin@phelps.com

***Counsel for Defendants M/V NOR GOLIATH, in rem, and GOLIATH OFFSHORE HOLDINGS PTE. LTD., in personam***

**CERTIFICATE OF SERVICE**

I hereby certify that on January 29, 2021, I electronically filed the foregoing ***Notice of 30(B)(6) Corporate Deposition*** with the Clerk of the Court using the ECF system which sent notification of such filing to all parties by operation of the Court's electronic filing system.

*/s/Miles P. Clements*

10